

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 03 2016

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

# SUPREME COURT OF ARKANSAS

### No. CV-15-804

| | |
|---|---|
| COLUMBIA INSURANCE GROUP, INC., AND COLUMBIA MUTUAL INSURANCE CO., INC. | Opinion Delivered: April 28, 2016 |
| PETITIONERS | CERTIFIED QUESTIONS OF LAW FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF ARKANSAS, WESTERN DIVISION |
| V. | |
| CENARK PROJECT MANAGEMENT SERVICES, INC.; ARKANSAS INFRASTRUCTURE, INC., DAVID BARRON; MICHAEL COLLINGS; JANICE COLLINGS, KIM COLLINGS; DEBRA COLLINGS; KENNETH WINBERG; MARIANNE WINBERG; GUY COLLINGS; CATHERINE COLLINGS; WILLIAM MILES; KAY MILES; AND K. GEORGE COLLINGS | |
| RESPONDENTS | CERTIFIED QUESTIONS MOOT. |

**COURTNEY HUDSON GOODSON, Associate Justice**

The present case involves two questions of law certified to us by the United States District Court for the Eastern District of Arkansas, Western Division, in accordance with Arkansas Supreme Court Rule 6-8. The certified questions arise from a complaint for declaratory judgment filed in the federal court by petitioners Columbia Insurance Group, Inc., and Columbia Mutual Insurance Co. (Columbia) to determine its obligations under the Commercial General Liability Insurance Policy (CGL policy) issued to its insureds, respondents Arkansas Infrastructure, Inc. and David Barron (AII).[1] Specifically, Columbia sought a determination that it had no duty to defend or to indemnify AII with respect to

---

[1] Barron is the president and general manager of AII.

claims brought against AII in state court by respondents Michael Collings, Janice Collings, Kim Collings, Debra Collings, Kenneth Winberg, Marianne Winberg, Guy Collings, Catherine Collings, William Miles, Kay Miles, and K. George Collings (Home Owners). On October 29, 2015, we accepted certification of the following questions of law:

> (1) Whether faulty workmanship resulting in property damage to the work or work product of a third party (as opposed to the work or work product of the insured) constitutes an "occurrence?"

> (2) If such faulty workmanship constitutes an "occurrence," and an action is brought in contract for property damage to the work or work product of a third person, does any exclusion in the policy bar coverage for this property damage?

*Columbia Ins. Grp., Inc. v. CENARK Project Mgmt. Servs., Inc.*, 2015 Ark. 396.

We reaffirm this court's previous position that a CGL policy does not extend basic coverage for a claim of breach of contract. Because there is no coverage, we consider the certified questions to be moot.[2]

The Home Owners in this case are related to one another by either blood or marriage. In contemplation of retirement, they acquired seven lots on which to construct six homes in the Platinum Peaks Estates Subdivision on Greers Ferry Lake in Van Buren County, Arkansas. The Home Owners retained CENARK Project Management Services, Inc. (CENARK), an engineering firm, to design the building pads for each of

---

[2] Contrary to the dissenting opinion authored by Justice Danielson, this court is not bound by the certifying court's formulation of a certified question. This court may, in its sole discretion, reformulate the certified question and even rescind our decision to answer a certified question. Ark. Sup. Ct. R. 6–8(a)(5) & (c)(1). Here, we have determined that the certified questions are moot because the issue of coverage is governed by our decision in *Unigard, infra*. Without question, this court possesses not only the authority but a duty to recognize and follow controlling precedent under Arkansas law, even when addressing questions certified to us by another court.

CV-15-804

2

the residences that were to be built on the lots.  The Home Owners subsequently entered into a contract with AII in 2005 to construct the pads.  According to the contract, the project entailed "earthwork to produce home building sites, road access, rock buttress slope stabilizations, site drainage, site utilities, subsurface drains and storm drainage, gabion retaining walls, base, paving, [and] curbing."  The contract contained a provision stating that AII agreed to perform the work in accordance with the plans, specifications, and drawings developed by CENARK.  By separate agreement with the Home Owners, CENARK agreed to oversee the work of AII in constructing the building pads.

In June 2012, the Home Owners filed a complaint against AII in the Circuit Court of Van Buren County for breach of contract,[3] asserting that AII had failed to construct the pads in accordance with the engineering plans and specifications designed by CENARK.[4] The Home Owners' complaint contained the following allegations:

> Commencing on or about April, 2011, plaintiffs began to discover cracks and/or separation in the foundations, patios, and other structures in their homes that were constructed by them upon their respective lots. As the cracks and separation continued and worsened, plaintiffs conducted an investigation and excavation of areas around and under their foundations, and discovered in March 2012, that:
>
> (i) the fill material under the foundations was not of the quality and quantity specified in the engineer's plans and specifications;
>
> (ii) that certain critical drains had not been installed in the foundation pads by AII during construction as required by the engineer's plans and specifications;

---

[3]  The Home Owners did not advance a claim of negligence for which the statute of limitations had expired.

[4]  In the Complaint, the Home Owners also sued CENARK for breach of contract, alleging that CENARK had failed to provide management and oversight of the project. Although CENARK is a named defendant in the case before the federal court, it did not enter an appearance there, and it is not a participant in the case at bar.

CV-15-804

3

(iii) that gabion walls and buttress walls were not constructed in accordance with the engineer's plans and specifications; and

(iv) that other aspects of the engineer's plans and specifications were not followed by AII during development and construction of the foundation pads.

The Home Owners also alleged that Barron had admitted that AII had failed to follow the plans, specifications, and drawings developed by CENARK during the performance of the contract. Further, they asserted that "[i]n the failure to follow the engineer's plans, specifications, and drawings in the construction of the foundation pad, drainage systems, buttresses and gabion walls, knowing that such components would be covered by foundation, fill dirt and soils, AII actively attempted to conceal its failure to follow such plans and specifications, and committed fraud upon the plaintiffs." The Home Owners sought "damages in the loss of the contract price paid to AII and CENARK, plus additional damages for the cost of work required in the past and that will be required in the future to repair, replace or remediate the faulty work done by AII."

It is undisputed that, at all relevant times, AII was insured by a CGL policy issued by Columbia. Columbia provided a defense to AII during discovery, but it subsequently filed the declaratory-judgment action in the federal court for a determination that it did not have liability under the policy. Columbia filed a motion for summary judgment asserting that the policy did not provide coverage for the Home Owners' claims. AII filed a motion for summary judgment on its counterclaim that Columbia had breached its duty to defend it in the underlying lawsuit.[5] The Home Owners also filed a motion for

_____

[5] AII also asserted that Columbia was estopped from denying coverage because it had undertaken the duty to defend without a reservation of rights.

summary judgment, contending that coverage existed under the "Products–Completed Operations Hazard" provision of the policy. The parties briefed the issues, and the federal court held a hearing on the various motions. On September 23, 2015, the federal court ruled that Columbia had an obligation to defend AII in the underlying lawsuit. *Columbia Ins. Grp., Inc. v. CENARK Project Mgmt. Servs., Inc.*, ___ F. Supp. 2d ___ (E.D. Ark. Sept. 23, 2015). The court denied Columbia's and the Home Owners' motions for summary judgment and subsequently certified the aforementioned issues to this court.

At issue in this case is a CGL policy. These policies have been in existence in various forms since 1940. *See Travelers Indemnity Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302 (Tenn. 2007); *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65 (Wis. 2004). The most recent revision came in to use in 1986. *Am. Family, supra.* Most CGL policies are written on standardized forms developed by an association of domestic property and casualty insurers known as the "Insurance Services Office." *Travelers Indemnity, supra* (citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993)).

The CGL policy in the instant case, like most CGL policies, contains several basic parts relating to insurance coverage. *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 137 P.3d 486 (Kan. 2006) (citing *Am. Family, supra*). The first basic component concerns the initial grant of general coverage. *Id.* The second part sets out various "exclusions" from the initial grant of coverage. *Id.* Finally, the third basic part involves "exceptions" to the exclusions, which reinstate coverage that was previously excluded from the general grant. *Id.*

CGL policies can contain exclusions for intended or expected losses, and for so-called "business risks," that are also known as "your work," "your work product," and "your property" exclusions. *Id.* A potential exception to a business-risk exclusion might be found in a provision regarding "products-completed operations hazard," depending on the terms of the policy. *See Am. Family, supra.*

The Wisconsin Supreme Court in *American Family* enunciated a three-step analysis for evaluating coverage in CGL policies. The court explained,

> First, we examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage. If it is clear that the policy was not intended to cover the claim asserted, the analysis ends there. If the claim triggers the initial grant of coverage in the insuring agreement, we next examine the various exclusions to see whether any of them preclude coverage of the present claim. . . . Exclusions sometimes have exceptions; if a particular exclusion applies, we then look to see whether any exception to that exclusion reinstates coverage.

*Am. Family*, 137 P.3d at 32–33.

Under the initial grant of coverage in the CGL policy in question, Columbia is required to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." In relevant part, the policy provides that the insurance applies to "property damage" only if the "property damage" is caused by an "occurrence." Thus, coverage is provided for "property damage" caused by an "occurrence."

The term "property damage" is defined in the policy as "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured." As stated in the policy, "occurrence" means "an accident, including continuous or repeated exposure to substantially the same

CV-15-804

6

general harmful conditions." The term "accident" is not defined in the policy. However, this court has defined "accident" to mean "an event that takes place without one's foresight or expectation—an event that proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected." *United States Fid. & Guar. Co. v. Cont. Cas. Co.*, 353 Ark. 834, 845, 120 S.W.3d 556, 563 (2003).

The first certified question of law presented to us asks whether AII's defective workmanship resulting in property damage to the work or work product of a third party constitutes an "occurrence." In deliberating this issue, we have come to the conclusion that the certified question rests on the premise that the underlying claim asserted by the Home Owners involves defective workmanship on the part of AII. It does not. Their claim is one for breach of contract. As a consequence, the basic coverage issue is controlled by our decision in *Unigard Sec. Ins. Co. v. Murphy Oil USA, Inc.*, 331 Ark. 211, 962 S.W.2d 735 (1998).[6]

In *Unigard*, this court examined the general grant of coverage in several CGL policies that contained like provisions. In summary, the policies covered sums that the insured became "legally obligated" to pay "as damages" "because of," or "on account of," "property damage" that was caused by, or arose out of, an "occurrence," which was essentially defined as an accidental event. *Unigard*, 331 Ark. at 222, 962 S.W.2d at 740.

---

[6] In his dissent, Justice Danielson incorrectly asserts that the underlying complaint is based on faulty workmanship. It is not. No claim of negligent or faulty workmanship is stated, as it is undisputed that the statute of limitations has expired for any claim of negligent or defective workmanship. The claim is one for breach of contract based on the failure to construct the pads in accordance with the plans, specifications, and drawings developed by the engineering firm.

CV-15-804

Property damage was defined as loss of, direct damage to, or destruction of tangible property (other than property owned by the named assured).

In that case, Murphy Oil had leased an island located in an Alabama river for the purpose of operating a petroleum-storage facility. During its occupancy, Murphy Oil routinely spilled petroleum products during operations. In addition, Murphy Oil allowed three major spills to occur in 1970, 1975, and 1982, which caused additional harm to the island. Despite its knowledge of the environmental damage caused by the spills, Murphy Oil returned possession of the island to the owner without remediating the damage. When the owner subsequently discovered that the island was contaminated with petroleum products, the owner sued Murphy Oil in an Alabama federal court for breach of the lease and trespass, seeking both compensatory and punitive damages. The breach-of-the-lease claim rested on the assertion that Murphy Oil had failed to surrender the premises in as good a condition as reasonable usage would permit, as required under the terms of the lease. Although the owner's complaint included an allegation of negligence, that claim was dismissed because the statute of limitations had expired. The jury in the federal court awarded $3.4 million in compensatory damages on the breach-of-the-lease claim. The jury also found that Murphy Oil had committed a trespass, but it assessed no compensatory damages based on that finding. However, the jury determined that the trespass had been accompanied by "malice, fraud, or oppression" and awarded $4.6 million in punitive damages, which was reduced by the federal court to $2 million. *Id.* at 218, 962 S.W.2d at 738.

Following that decision, Murphy Oil filed suit in the Union County Circuit Court against its insurance carriers seeking a declaration that its insurers were obligated to indemnify it for the Alabama judgment. The carriers appealed the decision that they were liable for the judgment under the terms of the policy. Although the parties on appeal raised numerous issues, this court deemed as dispositive the "threshold question whether the policies issued by the insurance carriers cover the liability that Murphy Oil incurred in the underlying Alabama suit." *Unigard*, 331 Ark. at 215, 962 S.W.2d at 736. We held that there was no coverage under the policies for breach of contract or for the punitive-damage award.

In our analysis, we began with the proposition that the question of coverage turned on the nature or type of liability that Murphy Oil incurred in the Alabama suit. After considering the allegations in the complaint and the jury instructions in the Alabama case, this court determined that "[t]he basis of Murphy Oil's liability for compensatory damages was simply its failure to honor its covenant to 'quit and surrender the premises hereby demised in as good state and condition as reasonable usage will permit.'" *Unigard*, 331 Ark. at 222, 962 S.W.2d at 740. Consequently, we concluded that Murphy Oil's liability for compensatory damages did not arise from conduct on the part of Murphy Oil that injured or damaged any property. We further observed that the judgment represented the economic loss the owner suffered on account of Murphy Oil's breach. This court also was not convinced that the nature of the claim was changed because the Alabama litigation involved property damage, and we rejected "Murphy Oil's broad contention that coverage is available to an insured under a CGL policy as long as 'property damage' is

CV-15-804

9

merely lurking somewhere in the underlying case." *Id.* at 227, 962 S.W.2d at 743.[7]  On the punitive-damage award, we said that it, too, was not covered because those damages were awarded for intentional conduct, labeled as "malicious, fraudulent, or oppressive." *Id.* at 225, 962 S.W.2d at 742.

The terms establishing the basic grant of coverage we considered in *Unigard* are in all material respects the same as those contained in the CGL policy at issue in the present case.  Focusing on the nature and type of liability asserted in the underlying suit, as *Unigard* instructs, the Home Owners' claim is that AII breached the contract by not adhering to the plans, specifications, and drawings prepared by the engineering firm.  As damages, the Home Owners are seeking the economic losses flowing from AII's alleged breach.  Although the underlying litigation touches upon damage to property, this does not alter the nature of the lawsuit, which is strictly a claim for breach of contract.  As in *Unigard*, we hold that coverage is not provided for the claim.[8]

This court is not alone in recognizing that breach-of-contract claims are not covered by CGL policies.  *Grinnell Mut. Reins. Co. v. Lynne*, 686 N.W.2d 118 (N.D. 2004) (stating that coverage under a CGL policy is for tort liability and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained); *Oak Crest Constr. Co. v. Austin Mut. Ins.*

---

[7] This court did suggest that the result "would be arguably different" had the case been tried on a negligence claim. *Unigard*, 331 Ark. at 222, 962 S.W.2d at 740.

[8] On July 27, 2011, the General Assembly passed Arkansas Code Annotated section 23-79-155 (Repl. 2014), which provides that a CGL policy "offered for sale in this state shall contain a definition of 'occurrence' that includes . . . [p]roperty damage or bodily injury resulting from faulty workmanship."  However, because the Home Owners' claims arose prior to July 2011, section 23-79-155 is inapplicable here.  We have not been asked to interpret section 23-79-155, and our findings are independent of that statute.

Co., 998 P.2d. 1254 (Or. 2000) (holding that CGL policy does not cover damages for the failure to perform the contract); *Redevelopment Auth. Of Cambria Cty. v. Int'l Ins. Co.*, 685 A.2d 581 (Pa. Super. Ct. 1996) (holding that the purpose and intent of a CGL policy is to protect the insured from liability for accidental injury rather than coverage for contractual undertakings); *Glenn Falls Ins. Co. v. Donmac Golf Shaping Co.*, 417 S.E.2d 197 (Ga. Ct. App. 1992) (recognizing that the coverage applicable under a CGL policy is for tort liability and not for contractual liability for economic loss because the completed work is not that for which the damaged person bargained); *Viking Constr. Mgmt., Inc. v. Liberty Mut. Ins. Co.*, 831 N.E. 2d 1 (Ill. Ct. App. 2005) (holding that the general-coverage provisions do not provide coverage for damages resulting from breach of contract; *Am. States Ins. Co. v. Mathis*, 974 S.W.2d 647 (Mo. Ct. App. 1998) (holding that the breach of a defined contractual duty occasioned by the insured's failure to construct ducts according to contract specifications was not covered under the CGL policy); *Newark Ins. Co. v. Acupac Packaging, Inc.*, 746 A.2d 47 (N.J. Sup. Ct. App. Div. 2000) (holding that tort liability is covered while contractual liability is not); *Bonded Concrete, Inc. v. Transcon, Inc.*, 784 N.Y.S.2d 212, 213 (N.Y. App. Div. 2004) (stating that the "purpose of a commercial general liability policy . . . is to provide coverage for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product . . . is not what the damaged [party] bargained for). Also, federal courts applying Arkansas law have relied on *Unigard*, to deny coverage under CGL policies where the action is based on breach of contract. *Riceland Foods, Inc. v. Liberty Mut. Ins. Co.*, No. 4:10CV00091 SWW, 2011 WL 2262932 (E.D. Ark. June 8, 2011); *Landers Auto Grp. No.*

CV-15-804

*One, Inc. v. Cont'l W. Ins. Co.*, No 4:07cv00921 BSM, 2009 WL 1956392 (E.D. Ark. July 6, 2009); *Cincinnati Ins. Cos. v. Collier Landholdings, LLC*, 614 F. Supp. 2d 960 (W.D. Ark. 2009); *Mid-Continent Cas. Co. v. Sullivan*, Nos. 4:07CV01154 JMM and 4:07CV01155 (E.D. Ark. Dec. 23, 2008).

We acknowledge that there is an opposing viewpoint, as several courts have held that there is no distinction between contract and tort claims when evaluating coverage under a CGL policy. *See, e.g., United States Fire Inc. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871 (Fla. 2007); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1 (Tex. 2007); *Am. Family, supra.* As a matter of stare decisis, we are not persuaded that this case warrants a departure from our holding in *Unigard.* There is a strong presumption regarding the validity of prior decisions, and it is necessary as a matter of public policy to uphold previous decisions unless great injury or injustice would result. *Miller v. Enders*, 2013 Ark. 23, 425 S.W.3d 723. We choose to adhere to the rule that precedent governs until it gives a result so patently wrong and so manifestly unjust that a break becomes unavoidable. *Couch v. Farmers Ins. Co.*, 375 Ark. 255, 289 S.W.3d 909 (2008).

In light of our conclusion that there is no coverage under the policy, the certified questions have become moot. We decline to address them, as answering the questions would constitute an improper advisory opinion. *Hempstead Cty. Hunting Club, Inc. v. Sw. Elec. Power Co.*, 2011 Ark. 234, 385 S.W.3d 123.

Certified questions moot.

DANIELSON and HART, JJ., dissent.

CV-15-804

12